UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILBERT DAVIS,

                            Plaintiff,

        v.

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.
_____

DECISION & ORDER

18-CV-194P

## PRELIMINARY STATEMENT

Plaintiff Wilbert Davis ("Davis") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 1, 2018, this case has been reassigned to, and the parties have consented to the disposition of this case by, the undersigned. (Docket ## 7, 21).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 17). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Davis's motion for judgment on the pleadings is denied.

# DISCUSSION

## I. Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1) whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform his or her past work; and

(5) if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

3

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

II.     **Analysis**

Davis contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and is the product of legal error. (Docket ## 10-1, 20). Davis's sole argument is that the ALJ erred by relying on the 2012 opinions of state consultative examiners Nikita Dave ("Dave"), MD, and Susan Santarpia ("Santarpia"), PhD, and state agency non-examining reviewer Hilary Tzetzo ("Tzetzo"), MD, all of which were, in Davis's view, stale by the time the ALJ issued his decision in September 2016. (Docket ## 10-1 at 8-11; 20 at 1-3). Davis maintains that these opinions were stale because they were rendered before Davis developed lymphoma and peripheral neuropathy, did not consider the limitations associated with his peripheral neuropathy, and thus were not based on a complete medical record. (*Id.*).

The Commissioner contends that the ALJ relied on the medical evidence as a whole in arriving at his RFC determination, including Davis's "medical records indicating that [his peripheral neuropathy] was stable and did not affect his daily living activities as well as the generally normal objective physical examinations after he developed the impairment." (Docket # 17-1 at 20-21). Upon review of the medical record, I agree with the Commissioner.

At step two of the sequential process, the ALJ found that Davis had the severe impairments of peripheral neuropathy, polysubstance abuse, and intermittent syncopal episodes

4

secondary to hypotension, along with several other nonsevere impairments. (Tr. 28-31).[1] Based on Davis's impairments, the ALJ determined that Davis maintained the RFC to perform a full range of work at all exertional levels, but that he should "avoid heights, sharps, and dangerous machinery" and "never climb ropes, ladders or scaffolds." (Tr. 34). In addition, the ALJ limited Davis to "frequent interaction with the public and occasional[] perform[ance] [of] complex and detailed tasks," along with "frequent[] finger[ing] and handl[ing] bilaterally." (*Id.*).

In reaching this RFC assessment, the ALJ relied upon "the medical evidence of record, [Davis's] activities, and the opinions of Drs. Dave, Santarpia, and Tzetzo." (Tr. 38). Specifically, the ALJ gave "significant weight" to Dr. Dave's June 25, 2012 internal medicine examination. (Tr. 454-58). Dave indicated that Davis complained of HIV, episodes of syncopal, and hypertension. (Tr. 454-55). Davis reportedly cleaned every day, cooked twice a week, did laundry once a week, showered four times and dressed seven times a week, and enjoyed watching television and listening to the radio. (Tr. 455).

Upon physical examination, Davis appeared to be in no acute distress, had normal gait, could walk on his heels and toes without difficulty, fully squat, used no assistive devices, had a normal stance, and could get on and off the examination table and rise from a chair without difficulty. (Tr. 455-56). Musculoskeletal tests were normal. (Tr. 456). Neurologically, Davis had intact sensation and full strength in his upper and lower extremities. (Tr. 457). Davis also had intact hand and finger dexterity, and full grip strength bilaterally. (*Id.*). In Dave's view, Davis's prognosis was "fair," and she opined that "[d]ue to syncope and near syncopal episodes with heat and possibly associated with hypotension at times, [Davis] should avoid ladders, heights, sharps, [and] operating machinery." (*Id.*).

---

[1] References to page numbers in the Administrative Transcript (Docket # 8) utilize the internal Bates-stamped pagination assigned by the parties.

The ALJ also gave "significant weight" to Dr. Santarpia's June 25, 2012 psychiatric evaluation. (Tr. 459-62). Davis reported that his sleep and appetite were normal and denied symptoms associated with anxiety, panic attacks, manic episodes, thought disorder, and cognitive deficits. (Tr. 459). Davis also stated that he consumed alcohol and used marijuana and cocaine weekly. (*Id.*). Santarpia's mental status examination of Davis revealed largely unremarkable findings: he was cooperative and had an adequate manner of relating and overall presentation; maintained normal motor behavior and eye contact; had adequate expressive and receptive language capabilities; had coherent and goal-oriented thought processes and a full range of affect; exhibited euthymic mood and clear sensorium; and was fully oriented and had intact attention and concentration. (Tr. 460). Santarpia noted that Davis's insight and judgment were poor and that his cognitive functioning was "in the low average range of ability"; however, his general fund of information was appropriate to his experience. (Tr. 461). Davis reported that he could dress, bathe, and groom himself, as well as cook, clean, do laundry, shop, and manage his money. (*Id.*). Davis socialized with friends and family, and his hobbies and interests included playing cards, watching sports and television, and listening to the radio. (*Id.*).

Based upon her examination, Santarpia opined that Davis only demonstrated "[m]ild impairment" in performing complex tasks independently and making appropriate decisions. (*Id.*). In Santarpia's view, these difficulties were caused by polysubstance abuse. (*Id.*). Santarpia's prognosis for Davis was "[g]uarded, given consistent use of alcohol, marijuana, and cocaine." (Tr. 462).

Finally, the ALJ gave "significant weight" to Dr. Tzetzo's July 2, 2012 psychiatric review, which incorporated a mental RFC assessment. (Tr. 463-80). Tzetzo opined that Davis "should be able to understand and follow work directions in a work setting (with low

6

public contact), maintain attention for such work tasks, relate adequately to a work supervisor for such work tasks, and use judgment to make work related decisions in a work setting (with low public contact) now." (Tr. 479).

The ALJ's RFC assessment that Davis could perform a full range of work at all exertional levels with certain specified limitations largely mirrored these medical opinions. (Tr. 34). In addition, the ALJ recognized Davis's subsequent diagnosis of diffuse large B-cell lymphoma, for which he was treated with chemotherapy beginning in May 2014, which itself led to the development in June 2014 of "a feeling of numbness and coolness to the palms which d[id] not interfere with his activity level." (Tr. 30-31, 619-21, 740).[2] At an appointment on June 30, 2014 at Erie County Medical Center ("ECMC"), Davis complained of "pain all over," including in his hands and feet, but was able to rise in a single motion from sitting to standing positions, appeared to be in no acute distress, and had normal gait and station. (Tr. 598-601). His complaints were consistent with "paresthesias (both hands and feet, worse in his hands)," and Davis was assessed with peripheral neuropathy, for which he was prescribed gabapentin. (Tr. 598, 601-02). Based upon the ALJ's review of the medical records relating to Davis's peripheral neuropathy and Davis's testimony regarding associated limitations, the ALJ explicitly limited Davis to "frequent[] finger[ing] and handl[ing] bilaterally." (Tr. 36).

Davis challenges the ALJ's reliance on the medical opinions of record because they did not consider Davis's peripheral neuropathy, a condition that developed after the opinions were rendered. (Docket # 10-1 at 10-11). Davis is generally correct that "an ALJ should not rely on 'stale' opinions – that is, opinions rendered before some significant

---

[2] Davis completed chemotherapy in August 2014 (Tr. 915), and his lymphoma was in remission by October 2014 (Tr. 759). The ALJ found Davis's lymphoma to be a nonsevere impairment because "it did not last at least 12 consecutive months." (Tr. 31). Davis does not challenge this finding.

7

development in the claimant's medical history," *Robinson v. Berryhill*, 2018 WL 4442267, *4 (W.D.N.Y. 2018), and that "[m]edical source opinions that are stale and based on an incomplete medical record may not be substantial evidence to support an ALJ['s] finding," *Davis v. Berryhill*, 2018 WL 1250019, *3 (W.D.N.Y. 2018) (alterations, citations, and quotations omitted). That said, "a medical opinion is [not] stale merely because it pre-dates other evidence in the record, where . . . the subsequent evidence does not undermine [the opinion evidence]." *Hernandez v. Colvin*, 2017 WL 2224197, *9 (W.D.N.Y. 2017) (citing *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order)). *Accord Morgan v. Astrue*, 2010 WL 3723992, *13 (E.D. Tenn.) ("[i]n every claim for DIB or SSI before an ALJ, some time will elapse between the date that a medical opinion about the claimant's condition is rendered and the date that the ALJ considers that opinion[;] [f]requently, new evidence about the claimant's condition will come to light during the intervening period of time[;] [t]he SSA's disability determination process would cease to function if ALJs could not rely on a medical opinion simply because some new evidence entered the record after the opinion was provided"), *report and recommendation adopted by*, 2010 WL 3723985 (E.D. Tenn. 2010).

In this case, Davis has not demonstrated that the record evidence relating to the impairment of peripheral neuropathy undermines the medical opinions of record.[3] As referenced above, Dave noted in her 2012 examination that Davis appeared to be in no acute distress, had normal gait, could walk on his heels and toes without difficulty, had a normal stance, normal musculoskeletal tests, intact sensation and dexterity in his hands and fingers, and full strength in

---

[3] Although Davis contends that each of the medical opinions is stale, the only opinion he specifically identifies as failing to account for his peripheral neuropathy is Dave's consultative opinion, which addressed his physical impairments. (Docket # 10-1 at 10-11 ("Dr. Dave does not mention any limitation on the use of hands in his medical source statement, and the diagnosis list does not include the peripheral neuropathy")).

8

his upper and lower extremities. (Tr. 455-56). Medical evidence post-dating Dave's opinion, which the ALJ considered, does not appear to be inconsistent with Dave's assessment.

For example, during a chemotherapy appointment at Roswell Park Cancer Institute ("Roswell") on July 10, 2014, Davis stated that he "fe[lt] well" and did not report symptoms of pain or numbness in his hands or feet. (Tr. 746-48). At a February 2015 ECMC appointment for "an initial Hep-C visit," Davis did not report any symptoms associated with peripheral neuropathy, although the impairment was noted as an "active problem" and gabapentin was listed as a current medication. (Tr. 802-03). On physical examination, Davis appeared in no acute distress, demonstrated normal coordination, gait, station, range of motion, stability, and muscle strength, and no sensory loss. (Tr. 805).

On March 13, 2015, Davis reported to ECMC for problems associated with syncope (which Dave explicitly considered during her 2012 consultative examination, and which the ALJ specifically accounted for in the RFC assessment). (Tr. 829). Davis stated that he had "generalized weakness since chemotherapy course, but denied any change in his status recently." (Tr. 830). A review of neurological symptoms revealed that Davis denied "headaches, numbness, tremors, or weakness" and generally denied being in pain. (Tr. 834). Discharge notes from March 16, 2015, indicated that Davis reportedly "was enjoying his usual state of health, *even active[ly]* enjoying the recent pleasant weather." (Tr. 823 (emphasis supplied)). Davis also appeared to be in no acute distress, was alert and oriented, "report[ed] no pain," and indicated that he was able to "walk independently." (Tr. 824-25).

On April 6, 2015, Davis had a follow-up appointment at Roswell related to his lymphoma. (Tr. 759). Davis was reportedly "doing well"; it was noted that he had "stable moderate neuropathy in his hands and feet," but that it was "not interfering with [activities of

9

daily living]." (Tr. 760). Davis was encouraged to engage in "regular exercise" as a means of preventative health care. (Tr. 764). On April 20, 2015, Davis's chief complaint at ECMC was that he "[m]issed 3-4 doses of his med[ications] in the last week." (Tr. 810). Davis reported "[n]o other issues other than chronic pain in hands and feet" and complained of "tingling and pain in his hands and feet," although his compliance with his prescribed neuropathy medication was noted as "unclear" as he "d[id] not recognize pictures of [g]abapentin or Neurontin." (*Id.*). Davis appeared in no acute distress, but "use[d] a cane to ambulate." (Tr. 812). Neurontin was "reorder[ed]." (*Id.*).

In July 2015, Davis reported at ECMC chiefly complaining of "pain in [his] hands and feet," which he described as feeling like "pins and needles," but noted that he "d[id] not think he [was] taking Neurontin." (Tr. 817). Still, Davis appeared to be in no acute distress on physical examination, and had normal gait, station, and muscle strength. (Tr. 819). At Roswell on August 17, 2015, Davis "report[ed] continued peripheral neuropathy involving his hands and mostly his feet," but also stated that it was "not currently [a]ffecting his balance or activities of daily living." (Tr. 902). Regular exercise was again recommended for preventative health care. (Tr. 910).

At a follow-up ECMC appointment in October 2015, Davis reported "no complaints" and "no issues," although it was noted that he had "chronic" neuropathy in his fingers and toes. (Tr. 859). Despite the neuropathy, Davis appeared in no acute distress, had no sensory loss, and had normal gait and station, and was instructed to continue with his gabapentin. (Tr. 861-62). In January 2016, Davis presented to ECMC for follow up "for chronic conditions" and "possible bed bug exposure." (Tr. 867). Aside from the bed bug exposure, Davis denied any new complaints, appeared to be in no acute distress, had normal gait, station, muscle

10

strength, stability, range of motion and coordination, and exhibited no sensory loss. (Tr. 867, 870). Davis was also instructed to continue his gabapentin. (Tr. 870-71).

During a February 2016 ECMC visit, Davis reported that he was "[t]aking all of his med[ications]" and was having "[n]o issues medically," but reported "having issues with his live-in girlfriend." (Tr. 873). Davis appeared in no acute distress, exhibited no sensory loss, and had normal gait and station. (Tr. 875-76). In addition, on April 27, 2016, Davis reported at Roswell that he was "generally feeling well," that his neuropathy in his finger tips and feet was "unchanged," and that he "[u]se[d] [g]abapentin with good relief." (Tr. 930).

The only evidence indicating that Davis suffered from functional limitations relating to his peripheral neuropathy is Davis's own hearing testimony. He testified, among other things, that he was "[p]retty much" able to hold and grasp things with his hands, but could not "hold onto [anything for] too long" because items would "just slip right out [of his] hand[s]." (Tr. 55). Davis also testified that his peripheral neuropathy required him to cook with a chair nearby to enable him to "get up and down" and affected his ability to walk long distances and stand for longer than fifteen to twenty minutes at a time. (Tr. 55, 58). On appeal, Davis challenges the ALJ's reliance on medical opinions that did not address limitations on the use of his hands. (Docket # 10-1 at 11 ("[t]he ALJ erred in relying on opinions dated four years before the hearing that did not take into account [Davis's] neuropathy[;] [t]his harmed [Davis] as he testified to being unable to hold onto things for sustained periods[,] . . . [and thus] remand is required")).

Taken together, the record evidence does not demonstrate a deterioration in Davis's functional ability as a result of peripheral neuropathy that would render Dave's assessment unreliable. Indeed, Dave's physical examination of Davis showed largely normal

11

results, and subsequent physical examinations – which occurred fairly often during and after Davis's cancer treatment – likewise revealed no signs of physical limitations. In fact, despite the frequency with which Davis saw treating sources, little evidence exists in those treatment records that peripheral neuropathy limited his functional abilities. To the contrary, the records show that Davis repeatedly told treatment providers that his peripheral neuropathy did not affect his ability to be active or engage in activities of daily living (*see* Tr. 760, 823-25, 902) and that his prescribed medication, when taken, provided "good relief" (Tr. 930). Moreover, in assessing Davis's RFC, the ALJ discussed and explicitly considered medical records post-dating the medical opinion evidence and seemingly credited portions of Davis's hearing testimony.[4] (*See* Tr. 30-31, 33, 36-37; *see also* Tr. 36 ("[c]onsidering [Davis's] subjective complaints of a pins and needles sensation in his hands and examinations showing no abnormalities of his upper extremities, [Davis] could frequently finger and handle bilaterally")). Accordingly, "[t]here is no evidence that the RFC determination does not adequately account for [Davis's peripheral neuropathy], and [Davis] does not suggest that any specific additional limitations were warranted." *Kidd v. Comm'r of Soc. Sec.*, 2019 WL 1260750, *4 (W.D.N.Y. 2019).

In short, Davis neither points to any medical evidence suggesting that after the opinions were rendered his condition deteriorated causing disabling functional limitations, nor identifies any relevant evidence post-dating the medical opinions that the ALJ failed to consider. For these reasons, I find that substantial evidence supports the ALJ's RFC assessment. *See*, *e.g.*, *Ambrose-Lounsbury v. Saul*, 2019 WL 3859011, *3-4 (W.D.N.Y. 2019) ("[claimant] has not shown significant developments in her medical history following [consultative examiner's]

---

[4] For reasons explained in his decision, the ALJ did not fully credit Davis's account of the functional limitations arising from his impairments. (*See* Tr. 35-37). Davis does not challenge the ALJ's credibility determination.

opinion that render it stale[;] . . . [claimant's] only new ailment after [consultative examiner's] examination was the 'left ankle swelling'[;] . . . [b]ut the record does not evidence any limitation from that swelling that the ALJ did not account for in the RFC[;] [s]o the ankle swelling is hardly a 'significant development'"); *Sexton v. Berryhill*, 2018 WL 1835494, *7 (W.D. Okla.) (finding no error where ALJ relied on opinion evidence that was completed "before all of the medical evidence was in and [[p]laintiff] became more severe[;] . . . [h]ere, however, the opinions of the state agency physicians are relevant to the period to which they apply, and [p]laintiff does not identify any evidence of a subsequent deterioration in [p]laintiff's condition that was not reviewed and considered by the ALJ[;] [t]he ALJ expressly stated that additional evidence . . . was received and admitted into the record subsequent to the hearing and that he reviewed this evidence and considered it in his determination[;] . . . [b]ecause the ALJ independently reviewed and considered the post-2014 evidence, and [p]laintiff points to no credible evidence inconsistent with the RFC, the undersigned finds no reversible error in the ALJ's reliance on the agency physicians' opinions"), *report and recommendation adopted by*, 2018 WL 1858255 (W.D. Okla. 2018); *Morgan v. Astrue*, 2010 WL 3723992 at *13 ("[i]n this case, [p]laintiff has not shown that the additional objective evidence he cites was inconsistent with the opinions of [consultative physicians][;] . . . [p]laintiff has not explained how a review of the new evidence he cites would have changed the opinions provided by [consultative physicians][;] [a]ccordingly, the [c]ourt cannot find error in the ALJ's decision to rely upon the doctors' opinions").[5]

---

[5] To the extent that Davis's papers may be read to contend that the ALJ improperly reached his RFC assessment without any medical opinion assessing the functional impairments associated with Davis's peripheral neuropathy (which he does not explicitly argue), I disagree. "[I]t is not *per se* error for an ALJ to make an RFC determination absent a medical opinion," *Lewis v. Colvin*, 2014 WL 6609637, *6 (W.D.N.Y. 2014) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013) (summary order)), "especially where the medical evidence shows relatively minor . . . impairments, [such that] an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *Id.* (quotations omitted).

# **CONCLUSION**

After a careful review of the entire record, this Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 17)** is **GRANTED**. Davis's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Davis's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

    *s/Marian W. Payson*
    MARIAN W. PAYSON
    United States Magistrate Judge

Dated: Rochester, New York
       September 12, 2019

---

Here, the record demonstrates relatively minor impairments associated with Davis's peripheral neuropathy; Davis generally reported that it did not affect his activities of daily living; Davis was prescribed gabapentin (Neurontin), although his compliance with the medication seemed inconsistent; and, when compliant, he indicated that the medication provided "good relief." (Tr. 930). Under these circumstances, I cannot conclude that the ALJ erred by failing to obtain a medical opinion assessing whether Davis had any work-related limitations associated with his peripheral neuropathy. The ALJ acted within his discretion in basing the fingering and handling limitation in the RFC on his review of the medical record as a whole. *See*, *e.g.*, *Mack v. Comm'r of Soc. Sec.*, 2019 WL 1994279, *4 (W.D.N.Y. 2019) ("[a]lthough the ALJ found that [p]laintiff has 'severe' impairments, the treatment notes and recommendations provided by [p]laintiff's treatment providers regarding his physical impairments do not reflect disabling functional limitations and thus, it was not impermissible for the ALJ to render a common sense judgment regarding [p]laintiff's physical functional limitations"); *Glena v. Colvin*, 2018 WL 739096, *5 (W.D.N.Y. 2018) ("[h]ere, [p]laintiff has several severe and chronic impairments[;] [h]owever, her treatment providers' statements and the actual treatment she has received do not reflect disabling functional impairments[;] . . . the [c]ourt cannot find that the ALJ committed legal error since this is one of those situations where the medical evidence, combined with [p]laintiff's own statements, indicated relatively mild physical impairment, allowing the ALJ to make an RFC assessment without an expert medical opinion").